Case 22-5496, Jason Laible et al. v. Timothy Lanter et al. Argument not to exceed 15 minutes per side. Mr. Herzig, you may proceed for the appellants. Thank you. Good morning, Your Honors. Aaron Herzig for appellants. I'd like to reserve three minutes for rebuttal. May it please the court. During the summer of 2020, the federal ATF was working with Northern Kentucky and Cincinnati police to apprehend Mason Meyer, the violent leader of a gun and drug trafficking organization. This joint task force led by ATF tried to apprehend Meyer on July 31st. He escaped, so they tried again on August 7th. That morning, Appellant Donald Scaff, a deputized ATF officer, met with his ATF colleagues to go over the ATF operational plan for effecting a traffic stop and an arrest warrant for Cincinnati police marked units and a canine unit to assist. He contacted Appellants Lanter and Thomas to assist with that support. Their specific, their primary task, their primary assignment, as is quoted in the operational plan, was to effect a traffic stop. That was their job that day. As to this traffic stop or this operational plan, was there a provision that also provided that at some point the ATF duties would taper off or cease and CPD, I'll call them, would really have the primary or sole responsibility for pursuit of a vehicle? Thanks for calling me CPD, I do that all the time. The operational plan, which is R58-1 in your record, no, does not have anything like that. It is an operational plan that talks about how all of these law enforcement agencies will work together. It does talk about where certain policies will be used in the event of a pursuit. The plan says that CPD policy would be followed. It never says that there would be a change in who was in charge of the operation or that somehow the two agencies, the three agencies, would separate and stop doing the task. The operational plan starts with two check boxes. One, vehicle stop. Two, arrest warrant. Because that was the job all of these law enforcement officers were engaged in that morning. Mason Meyer, like I said, was the leader of a violent organization. He had fled them a week earlier and he had done it with sophisticated means. He had switched cars in the middle of a chase. Fled them meaning the local police or ATF? No, the ATF task force. They had been pursuing Meyer throughout the summer of 2020 and you'll see that. There were federal charges. He was wanted for federal offenses, right? These were state warrants but there were also federal offenses. He's now under indictment by the federal government here in the Southern District of Ohio for federal offenses. He pleaded guilty to the murderer, sadly, of the labels resulting from the crash that occurred that day. But the joint task force was getting Mr. Meyer off the street. So ATF even before the day, the relevant day, was involved in these were all state charges or state offenses? They were at the time state offenses and yes, your honor, if you take a look at page ID 443 of 58-1, it describes essentially the month of July and the work that the ATF task force bringing together all three of these agencies was doing, which was to apprehend Meyer. He was working across state lines the morning, the afternoon that they... So just basically at a high level, you would think if they're state charges, that the state or local police would be investigating them. I know they cooperate but you have a federal agency actively leading an investigation into an individual who maybe has committed federal offenses but has only sought for state offenses at the time? These were state warrants. He had committed federal offenses. He was a felon under suspension. He was trafficking in guns. Was he indicted for federal offenses? He was, subsequent to these events, indicted for federal offenses. But in relation to this part of these, as part of this, the search or pursuit, not the day of pursuit, but the whole broader scheme was for, it was, there were federal offenses for which he was indicted that were part of this overall process of investigation. Exactly, your honor. One of the ATF task force was a federal indictment under federal charges. And part of why this is important, of course, in this area, as you know, we sit at the corner of Ohio, Kentucky, and Indiana. These joint task forces are important for tracking people who easily work across state lines as Mr. Meyer did. Officer Lanter, he was on assignment or detailed to or deputized under the U.S. Marshal Service, is that correct? Yes, your honor. But they didn't play a role in this, the attempted arrest and pursuit that day. The Marshal Service did not, am I correct? That's correct, your honor. He was, at the time, part of a Marshal Service operation tracking fugitives. But with respect to the operational plan, he was called in. And if you look at page ID 446 of the plan, there are 13 personnel who could be involved. Number 11 is CPD marked units. That turns out to be Officer Lanter. Number 13 is CPD K-9. That turns out to be Officer Thomas. But no, his deputization for the marshals was not the main reason he was there that day. I think it's important to note that he was trusted by the federal government and deputized in that way. What's the significance of the changing the radio frequency or radio? This gets does this happen exactly when Meyer leaves his home? Do they switch over from ATF or shared frequency to one that's just CPD? Yes, your honor. The plan is for them to see Meyer leaving his home, which they do that day. In fact, what they see him doing is shopping a weapon to people who want to buy it in the trunk of his car. But the idea was to get him out of his house, affect a traffic stop outside the house. It's just, I think, easier operationally than trying to assault a house. The switchover happens when he evades that first attempt at a traffic stop. He's now on the streets of the city of Cincinnati. So switching the radio frequencies is necessary because, of course, everyone within CPD now needs to know that there's a pursuit that has started. There's a series of cars that track him. Eventually, Officer Lanter, now Lieutenant Lanter's marked car, tries to stop him and then he runs. And that's when they switch. It's a safety measure because, of course, every other officer needs to know that a pursuit has started. Of course, that switch doesn't mean that there was a change in who was involved in the operation. The ATF remained on the radio. In fact, the ATF officer in charge, the RAC in charge of this investigation, was the one telling everyone in the operation that Meyer was in the car, where he was moving. He was the one tracking the pings of the cell phone off the cell tower. And so the radio switches. We think that's of no import. There is no case that suggests that there is any import. In these West officers working together in a law enforcement situation and conducting law enforcement operations the entire time at issue, suddenly switch from one employer to another or suddenly fall outside of federal employment. There isn't a case like that and it wouldn't make sense for there to be. These operations wouldn't work if an operational plan and the actual operation had the officers thinking the whole time who's in charge, who's not in charge. Can you give us an example of something that the officers could have done that would have taken them out of the protection of Westfall immunity? So you're saying this case they're protected. It's an ATF plan. ATF people are running it. ATF has the point-by-point. They're involved. What could they have done that would have taken them, in your mind, outside of Westfall Act protection? A few things, Your Honor. I'll give you two examples. One is with these particular officers. Let's say they broke off the chase and robbed a bank. They would no longer be within the scope of employment. The other way to look at it, I think, is if other officers from Cincinnati police had decided to join the pursuit and they hadn't been a part of the task force to begin with, those officers wouldn't be acting in federal employment just because they came to the aid. As long as the officers here are sticking to the general framework plan that was set out in the beginning, they should be immunized. Yes. Kentucky law, which applies here because it's the forum state, and you look to the, when it comes to the scope of employment inquiry, you look it to the state law, is pretty clear that when you're an employee, the second part of the inquiry anyway, is if you're an employee of an employer here, the federal government, that's our argument of course, is whether you're furthering that Doe v. Holland from a couple years ago is one I would point to where two members of Congress tweet allegedly defamatory statements and this court found that they were within the scope of their employment because one thing Congress people do is tweet about issues of public interest and that is within the scope of their employer. That case is certainly right. This one, I'm familiar with it. Yeah, this one's harder, I think. So what LOAG, this district court relies on LOAG as sort of setting the legal standard here and uses kind of a direction test, if they're under the direction of the federal government, that would count. Is there other authority we should be looking at? One, and two, assuming we're looking at LOAG, how do you, how do you read it as applicable to this case? So first, your honor, I think Holland is actually, I think this actually is just as easy as Holland, at least as to Sgt. Scaff, who was clearly a deputized officer. I think, I think it is a harder case as to the other two and, and, and the district court looked at them separately and I think that's fair. We think they're all within the scope. LOAG, LOAG is a contract case. It really talks about a contractual relationship and what that case I think is more about is whether there is an independent contractor relationship than anything else. We don't have that here. What we have are these joint task forces of officers engaged in a quintessentially governmental activity trying to get a really bad guy off the street. They work together to do that and we think that fits well within the understanding of agency under 2671 and 3370. Does your argument with respect to Lanter, is it because he was working with ATF or do you rely on his, his relationship with the marshal service? The former, your honor. It's that he was called in as a member of, he, he's number 11 on the list within the ATF operation. So any, so under your theory, any Cincinnati police officer who worked with ATF in this operation would be entitled to immunity under the Westfall Act? Yes, your honor. If they were, if they were contemplated within this ATF operational plan. Like I said, if someone just kind of joined it separately later, I think that would be a different question. But when you're talking about the officers that were necessary to affect a traffic stop and arrest Mr. Meyer, that had to include the marked units in order to affect a traffic stop and in the event of, of a pursuit. And, and so they were necessary to this operation. I see I'm at my original time. So unless there are any questions, I'll save it for rebuttal. Thank you. Good morning, your honors. And may it please the court, Katherine Putty for the United States. The operation to apprehend Mason Meyer was not led or orchestrated by the ATF. Rather, it was conducted according to a clear division of responsibilities as between ATF and the Cincinnati Police Department. This respect... Are you conceding that if it was led by ATF, then you lose? I, I not, certainly not with respect to Lanter and Thomas, who are not at all employees of the federal government. There is no question that if Sergeant Scaff had been acting under the direction and control of ATF on an ATF only operation, that there would be Westfall Act immunity. This is not a case about whether... Scaff was working for ATF, right? He was working for ATF, although there are two parts to the inquiry. There is the status question and then there is the scope of employment question. The scope of employment question is not decided by the observation that he had been deputized. Wasn't he basically full-time with ATF at this point? Whether, whether he was... I mean, if the conduct from which... Answer yes. Answer yes. He was basically full-time with ATF at this point, wasn't he? Not to the exclusion of his employment with the Cincinnati Police Department. I think that's a critical point, your honor, because if, if saying that he was full-time with ATF means that he has lost his authority to do things under the authority... Not necessarily. Exactly, exactly, your honor. I mean, what he was doing day to day was working for the ATF, right? That, that is right. That is not, those are not the actions from which these claims arise. Every claim against Scaff in the complaint, this whole lawsuit with respect to Scaff, has to do with the actions he took in supervising his fellow CPD officers, in assuming the officer in charge, all of the claim positions. There's a, I mean, there's this high-level Akaponte, who's sort of the mastermind of the, of the day's activities, the plan, is AT, is an ATF employee, right? I would disagree with the characterization, your honor, that he was the mastermind of the day's activities. He was in charge of ATF's participation in the operation. Did he draw up the plan? I mean, did CPD have much to do with, like, drawing up the plan for that? ATF develops an operational plan for every operation. The plan describes ATF's role in the operation. CPD might similarly have written down a plan describing its own role in the operation. I'm not aware that they did, but you can see, for example, in the list of assignments, there's a specific assignment given for every person on the ATF, on the task force. I mean, you can literally change hats during the middle of the, first thing you do, you're wearing one hat, the next thing you do, you're wearing the other hat, because it's all kind of a sequence of events of trying to apprehend Meyer. So you can be ATF at one moment and CPD a different one? Your honor, this, there was a very, very clear division of responsibility here that was not only reflected in the plan, but borne out by the conduct of the officers. There was a very deliberate... Part of what happened and what part of the plan was, during what part of the plan, was Scarfe acting as a Cincinnati Police Department officer? When he was assuming, when he announced himself as officer in charge of the pursuit, a position that exists only as a creation of CPD policy, he became, he started to work under the authority of the Cincinnati Police Department. I don't see how, when the whole point of the operation is to apprehend Myers, I don't see how ATF separates itself from the possibility that somebody is actually in a car pursuing him. I'm not sure I understand the question. It just seems to me that it's a very artificial way of looking at it, that, you know, one minute it's ATF's show, the next minute it's CPD's show, and Scarfe becomes associated with CPD for purposes of the statutory immunity at a particular time. point in the overall scheme, and we're supposed to decide at what point it happened. I mean, that makes it really a factual question, whether he's entitled to immunity. It is, I mean, there's no doubt that this inquiry is a very, very case-specific inquiry, but this is not the sort of, you know, looking into the specific details of every second of what happened. Here, there was an... It seems to me you're sort of advocating for that. Well, the operational plan, it was very clear in assigning some responsibilities to ATF. For example, had there been an open-air assault on Meyer as he left the residence and headed toward a vehicle, that was ATF's responsibility. The plan was equally clear in assigning the responsibility for vehicle pursuits to CPD. There are cooperative operations between state and local law enforcement every day in this country, and that does not mean that the United States assumes that ATF is responsible for that. During this period, though, Scaff was deputized to ATF. I think this is back to what Judge Raylor said. His full-time job was working with ATF, right? He did work with ATF regularly. There's no question... Regularly or full-time? I don't want to say full-time to suggest an exclusion to the exclusion... Is there some evidence in the record that he wasn't full-time for ATF and that he was doing some stuff for the police department? To suggest that he was working for ATF to the exclusion of the Cincinnati Police Department is not correct, and here he had no authority by virtue of any federal employment to assume this position as officer in charge. That was not something any federal employee has the authority to do. He could never have done that by virtue of his position on the task force. He could only have done that because... Where would we look for the source of the statement you just made? I think it is extremely helpful to look at the Cincinnati Police Department's own investigation where they... Wait a minute. I was asking you about something that I think would go to ATF's procedures, not the police department's procedures. Except that the authority for him to assume this position as officer in charge and direct the conduct of fellow Cincinnati Police Departments goes only to the Cincinnati Police Department. And that's why Cincinnati conducted an investigation of the incident to evaluate its own employees' compliance with its own policies. Because all of the responsibilities that Scaff assumed as officer in charge of the pursuit derived from his position with the Cincinnati Police Department. What tells us that? Well, the investigation describes his exclusive responsibilities as officer in charge. That's not something that... How do we know this other than your statement? Where do we look in the record to find that he couldn't have done this in his capacity of working with ATF? What's in the record other than... I mean, what you say is not in the record. So where do we find it in the record? The Cincinnati Police Department investigation is very helpful in this respect. The occupantee... That wouldn't tell us anything about what the scope of his duties with ATF were. Well, Your Honor, I think the scope of his duties with ATF could not extend beyond ATF's own authorities or role in participating in... Well, then where do we find the scope of that authority? There are, I think, deputization papers, but I think the occupantee declaration describes the federal authority that is... or the general scope of federal authority involved here. And it does not extend to directing the conduct of CPD officers. And every claim against Scaff arises from his alleged failure to adequately supervise the pursuit. And that involves only instructing the conduct of other police department officers. And to the extent that my friends focus on Scaff's purpose and the officer's general purpose in apprehending Meyer, which was certainly a shared purpose of ATF in participating in this operation, it is respectfully a little bit beside the point because we have never, ever contended that what he was doing was, you know, for his own ends beyond the scope of employment in a personal sense. And it is clear in the Patterson case... I don't know that he was saying the personal sense. Do you agree that ATF was sort of... was chasing Meyer and had been chasing him during this period of time leading up to the day's events? I believe that for... earlier in the summer, that had been mostly the domain of the local police forces. And there had been, I think, an attempted attempt to apprehend him earlier in a situation that involved only local police departments. And that ATF did come in to assist. And then the plan for the day was Occupantigan was the leader. I mean, I read this as it was an ATF plan. It wasn't... CPD wasn't really the mastermind behind the plan. It was ATF. The operational plan was an ATF plan because it described ATF's role in the plan. The operational plan is like, I don't know, the offensive coordinator for the football team. Like, here's the play we're going to run. And everyone's, like, working for the offense. And if someone makes a... goes the wrong way or something, they're still part of the overall plan of what they're trying to achieve. No, no, Your Honor. In that situation, everyone is on one team. The operational plan speaks for everybody. I think if you look at the list of assignments in the operational plan, you will see that there is a specific assignment for every ATF agent and ATF task force. Everyone's going to have a specific assignment. Here's what you do. Yeah, here's what you do. Yes, exactly, Your Honor. But what there's not specific assignments for are the CPD folks. They are just described in general because it was not ATF's responsibility to prescribe how they would exactly... They had a specific role to detain him when they were doing the original detention and then ATF would show up afterwards. But I think if you look in the list of personnel assignments in the operational plan, you will see a very big division. There's CPD-marked units just described as a whole, whereas for all of the ATF people, there is an individual line for each person. And this reflects what happened here, which is that ATF did not prescribe this plan for all of the units involved. ATF described its own role in the operation, and that's why the mutually reinforcing conduct of the officers is extremely helpful in understanding the plan here because it's not just that the plan described this division. CPD agreed to the plan, right? They didn't object to the plan. This is the plan that was laid out they agreed to. I think they came to an agreement about the plan, and then ATF described this plan or memorialized the plan. But the plan itself was not prescribed for everybody. It's hard for me when you have basically an ATF pursuit. I mean, ATF was after this guy. ATF comes with a way to devise a way to catch the guy. The officer in charge, Scalf, really appears to me to be an ATF employee. And everything that's done is basically consistent with that plan, more or less. And you're carving out two people, and it's really slicing things pretty thin, I think, especially to slice out three of the people. I think Scalf is pretty easily included, but even the other two. We're really sort of looking at this at a micro level to see if each move they made, was it a CPD or ATF? And this whole overall scheme was ATF. No, Your Honor. Not at all. It furthers the interest of law enforcement cooperation to allow law enforcement to engage. All true. I agree they're coming together, but who is in charge? Who is sort of the impetus behind this? It just feels like it's ATF. If I may, Your Honor, it furthers law enforcement interest for them to come together in a cooperative operation and to describe and to assign to themselves respective clear responsibilities to each part of the operation. ATF does not do vehicle pursuits. That's not something ATF would have been involved in. So to effectuate their plan, they need CPD. Let me put it this way. Suppose ATF was never in the picture. Do we have any evidence that CPD was going to try to start an investigation of Meyer and try to stop him and chase him to Kentucky? Local police department, including CPD, had already attempted this, Your Honor. So yes, we do. With or without ATF? Without ATF. Okay. So they did it without ATF. This time it was with ATF. Were they just looking for him, or was there some specific operation to catch him that you were referring to? I believe there was a prior operation where he evaded. Where is that in the record? I think it is described, at least in the complaint, but I'm not sure exactly where the particular record site would be beyond this. But this is not an ATF orchestrated plan. This is a joint and cooperative operation, and the federal government engages in these cooperative operations with local law enforcement every day all across the country and does not thereby assume liability for officers over whom it has no supervisory authority, no hiring authority, no training authority, and has absolutely no ability to direct and control their actions. I mean, SCALF gave, you're saying no, what Lamar and Thomas did has no connection to ATF, but SCALF gave them permission to go to Kentucky. And SCALF, in my mind, if you assume for a minute that SCALF is ATF for this purpose because he's basically fully employed by them and is running this operation, he's the one who tells them to go across the border. So that order comes from someone who's very much affiliated with ATF. But there's a reason that Acapinti was not the source of that information because the federal officers, by virtue of any federal employment, had no authority to direct these actions. That's why he had to do it solely by virtue of his Cincinnati employment. I think it is, you know, the dual status cases, Maryland and Denton, these cases do describe a very important question here, which is who had the specific authority to control the conduct from which the claims arose. And with respect to the relationship between this case and Patterson and Holland and that purpose to serve the employer's interest, those cases are very clear that that inquiry comes up in the intentional tort context because that is where you look to whether somebody was serving their own personal motives. But that is not at all the situation here. What is the significance, if any, that apparently the warrants that were being executed that day were state warrants? Apparently there were some federal warrants outstanding, but they were not actually being executed upon that day as I understand it. Does that make any difference at all? If I may, Your Honor, I see. I think it is of great significance because it illustrates, as everything else in this case does, that ATF was assisting this local operation. I do understand from the Acapinti declaration that there were no federal warrants at the time, that he was wanted on state offenses. Can I ask one more question? Sure. You have been very helpful, so I appreciate it. What is the importance of Logue to this case? The district court relied on it. Is that controlling here? Are the facts there similar to this case? Yes, Your Honor, I do think it is controlling here. I think the status cases, including the Maryland case especially, even though they are the two separate questions. I am talking about Logue. Right. Logue is one of the status cases. The relationship between the status question and the scope question is, I think, very strong. But the importance of Logue is describing how there can be local officers very helpfully assisting and providing services to the federal government that the United States does not have authority over. In that case, they were just deciding whether they were contractors. They said they are definitely contractors, no federal control or direction. And that is different in this case because they are not contractors. Logue also has the on behalf of language analysis as part of it. And so in that respect, it is still quite helpful to this case because it analyzes the on behalf of language as well. And it does emphasize that liability turns on who had the authority to supervise the detailed physical performance of the work. And here, there was no federal authority to supervise. Supervision is the key, you think? That is right, Your Honor. All right. Mr. Hearn. Thank you, Your Honors. I think the Court's questions point to the right level of generality to look at this. This was a comprehensive ATF operational plan. It, in fact, adopts CPD policy. If you look in the plan, it never says CPD shall be in charge of a pursuit. It says that CPD will initiate and monitor under the CPD policy. So ATF effectively has adopted the CPD pursuit policy because it does not have one of its own. The plan also says, though, except under extraordinary circumstances, high-speed pursuits are expressly prohibited. Yes, Your Honor. It becomes a judgment call of the officers. It's the policy that all of the officers were abiding by during this operation. Under the record, SCAF authorized this high-speed pursuit would be your contention? Yes. Yes, Your Honor. As a federal employee, I suppose. Yes. He was deputized. He was working every day at the federal building right across the street here at an ATF desk with an ATF badge and gun under ATF training. He was an ATF-designated and deputized officer every day. So any officer, Cincinnati police officer, who engaged in a high-speed pursuit, let's say Thomas, the canine officer, any other officer derivatively would be acting under federal authority under your argument? Yes, for two reasons. One, because they're specifically – we don't have their names, but we know their roles are specifically listed as part of the plan. And two, they were the ones called in by SCAF acting as an ATF officer to help effect the stop. But what if an officer joined the pursuit who was not in the plan, CPD officer, and SCAF or Atlanta asked them to join the pursuit because they needed another car or two, would that officer be a federal employee? I think that's a tougher question. I certainly think if they were asked to and it was necessary, they would fall in the same places as Lanter and Thomas. The distinction I was making before was if you have an officer who on his own decides to join this operation without being called in, and, of course, no one else was. The way these high-speed pursuits work, they have just as few cars as possible involved in the pursuit. And to your point about them being expressly prohibited except under certain circumstances, the officer's judgment was those circumstances existed that day, particularly because he had fled in a sophisticated manner just a week before. And I think it would be safe for law enforcement to assume that now that he's been chased twice, well, maybe a third time is not a charm in a situation like this. Your friend on the other side makes a point that I think is helpful to their case, which is that on a daily basis there are many joint federal-local-state investigations and that ruling in your client's favor sort of kicks the doors pretty wide open for Westfall immunity to a host of state or local actors that would never be thought to be considered by the statute. So is that wrong or is this case special or what's your response to it? I think, Your Honor, that from a policy perspective, the worst outcome would be to decide that these officers are not part of within the federal government's purview. There is no case like that right now. We've said so several times in briefing below and here, and the other side has never come up with a case where a deputized officer or officers is not part of federal law enforcement. And I think it will have real risks for interstate federal-local cooperation if suddenly local law enforcement has to think to themselves and local chiefs of police, local city managers have to start thinking, well, gosh, maybe the federal government doesn't think we're on the same team. Maybe they think there are separate teams here and that we're not all acting together. And what does that mean for us? So I think you can make a rule here that does not open the door the way they suggest and says, look, specifically when you're in an operational plan and called in for the purposes of executing that operational plan, you are under the federal government's protection without opening the doors to everyone. I think you can write that rule narrowly. I think the hard part is if you go the other way, this case will stand for the idea that even if you are embedded at ATF and working for ATF every day, someday the federal government may say, you know what, the facts didn't work out. This was an ugly case. Bad things happened at the end, and so we're going to cut you loose. And I think that's a much worse rule. Thank you for your time, Your Honors. We hope you reverse. We appreciate very much the arguments both of you have made, and we'll consider the case carefully. Thank you.